IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 13-cv-02721-BNB

LINDA VAN HANKEN, a/k/a LINDA CRAWFORD,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

Defendant.

_____

## ORDER

_____

This action seeks review of the Commissioner's decision denying the plaintiff's claim for

supplemental security income benefits under Title XVI and disability insurance benefits under

Title II of the Social Security Act.  The court has jurisdiction to review the Commissioner's final

decision under 42 U.S.C. § 1383(c)(3).  The matter has been fully briefed, obviating the need for

oral argument.  The decision is AFFIRMED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff filed her applications for benefits on March 14, 2008.  *Social Security*

*Administrative Record* [Doc. #16] (the "Record"), pp. 364-71.[1]  The plaintiff alleged disability

beginning January 5, 2006, due to a cervical spine condition, degenerative disc disease,

headaches, and depression.  Id. at pp. 230-31.  Her applications were denied on July 10, 2008.

Id. at pp. 1237-40.  The plaintiff requested a hearing before an Administrative Law Judge

_____

[1]I refer to the official page numbers of the Record which are found on the lower right-hand corner of each page, not to the page numbers that are assigned by the court's docketing system.

("ALJ").  Id. at p. 241.  A hearing was held on December 16, 2009, and a supplemental hearing

was held on February 18, 2010.  Id. at pp. 85-229.  On March 22, 2010, the ALJ issued a written

decision finding that the plaintiff was not disabled as defined in the Social Security Act.  Id. at

pp. 61-84.  The Appeals Council denied the plaintiff's request for review.  Id. at pp. 1-6.  The

ALJ's decision is final for purposes of this court's review.  20 C.F.R. § 404.981.[2]

On January 19, 2004, the plaintiff was seen by a care provider at the Mountain Family

Health Center in Nederland, Colorado, for "feeling overwhelmed & crying a lot."[3]  She was

crying and trembling during the appointment but did not have "plans of self harm."  The plaintiff

was diagnosed with depression and anxiety.  She was given samples of Celexa and referred for

counseling.  *Record*, p. 513.

The plaintiff was seen again by the same care provider on February 5, 2004.  She was not

crying and was not as angry or irritable.  She reported feeling "more complacent" and "less

bothered by things."  She was  responsive and interactive.  She was "mad @ episode where

husband hurt her family (emotionally)."  The care provider diagnosed her with depression and

anxiety and noted that the plaintiff had been using Zoloft samples, but was given Celexa "until

own PAP supply here."  Id. at p. 512.

The plaintiff was seen by the same care provider on February 17, 2004.  She reported that

Celexa was not helping her depression and that she "felt somewhat better" when she was on

_____

[2]All references to the Code of Federal Regulations are to the 2014 edition of part 404, which addresses claims under Title II of the Act.  All cited regulations have parallel citations in part 416, which address claims under Title XVI of the Act.

[3]The name of the care provider is illegible.  The progress note does not indicate where the plaintiff was seen, but progress notes from subsequent dates indicate that the plaintiff was being seen at the Mountain Family Health Center.

Zoloft.  She reported suicidal thoughts like driving off a cliff or shooting herself.  The plaintiff cried "uncontrollably" throughout the interview.  The care provider documented "Stress: 18 y.o. son has paranoid schizophrenia - is threatening to kill her 21 year old son.  18 y.o. is being looked for."  The plaintiff was diagnosed with depression with "suicide thoughts/ homicide thoughts." The care provider contacted the emergency room and documented that the plaintiff was to be seen by the emergency room doctor for a psychiatric evaluation and a 72 hour mental health hold.  Id. at p. 511.

On February 19, 2004, the same care provider noted that the plaintiff called to cancel her February 18, 2004, appointment because she was "inpatient at this time."  She was on Prozac, was doing better, and was to be discharged from the hospital to a friend's house.  Id. at p. 510.

The plaintiff was seen at the Mountain Family Health Center on February 23, 2004.  The care provider documented that the plaintiff was discharged from the hospital on February 19, 2004; had a restraining order against her husband; had left shoulder pain; was on Prozac; and was feeling "much more calm."  She was diagnosed with situational depression and ordered to continue taking the Prozac.  Id.

The plaintiff was seen at the Mountain Family Health Center by Dr. Katherine Drapeau, D.O., on April 20, 2004, with a dental abscess.  The plaintiff reported that she was doing better in terms of depression and anxiety.  Id. at p. 509.

On May 19, 2004, a registered nurse documented that the plaintiff called the Mountain Family Health Center complaining of a slight headache and asking what would happen if she did not take the Prozac on a regular basis because she kept forgetting to take it.  She was told that the headache could be a side effect of the Prozac and to make an appointment if it got worse.  She

was also told that the Prozac would not be as effective and that her symptoms could return if it was not taken regularly.  She was advised to take the Prozac at the same time of day.  Id. at p. 508.

On June 9, 2004, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center for pain in her left shoulder for one month.  The pain radiated down her left arm and she experienced some left arm numbness.  She had no history of an injury nor did she complain of any headaches.  Dr. Drapeau documented that she had a palpable spasm in her left trapezius muscle and along the scapular border.  The plaintiff was diagnosed with severe left upper back spasms.  She was referred for physical therapy and prescribed medications.  Id. at p. 507.

On January 4, 2005, the plaintiff was taken to JFK Medical Center Emergency Room in Atlantis, Florida, after being rear-ended while driving a vehicle.  Id. at pp. 474, 480.  She complained of pain in her neck, head, and left leg.  Id. at p. 483.  X-rays taken of her cervical spine showed degenerative changes at C5-6 but were otherwise negative.  Id. at pp. 480-82.  The care provider documented that the plaintiff did not suffer a loss of consciousness.  Id. at p. 474.  She was discharged the same day with a diagnosis of neck injury and a prescription for Lortab.  Id. at pp. 477, 484.

On January 11, 2005, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center for an evaluation of her pain.  The plaintiff rated her neck and back pain as "6."  She was taking Lortab for the pain.  She had decreased range of motion in her neck and "very tight musculature."  She was diagnosed with cervical strain with spasms, prescribed Ultram and Flexeril, and referred to physical therapy.  Id. at pp. 505-506.

On January 19, 2005, the plaintiff was seen at the Mountain Family Health Center

because she had slipped on ice the previous night and hurt her ankle.  The care provider noted that the plaintiff was on Hydrocodone, Ultram, Flexeril, and Prozac.  She was referred to the emergency room.  Id. at pp. 504-505.

The plaintiff was seen at University Hospital that afternoon.  Id. at p. 548.  X-rays revealed a spiral fracture of the distal fibula and a non-displaced fracture of the posterior malleolus.  She was placed in a splint, prescribed Vicodin, and discharged from the emergency room the same day.  Id. at p. 546, 549.  The plaintiff was seen in the Orthopedic Clinic on January 25, 2005.  She had minimal swelling.  She was placed in a short-leg cast and directed not to bear weight for four weeks.  The plaintiff reported that she smoked less than one pack of cigarettes per day for 15 years.  She was told that her fractures may take longer to heal because she is a smoker.  She was not prescribed any other narcotics at this time.  Id. at pp. 545-46.

On January 21, 2005, the plaintiff called the Mountain Family Health Center and stated that the Vicodin was not relieving her leg pain.  She requested a stronger medication.  The care provider discontinued the plaintiff's Ultram and prescribed Percocet.  Id. at p. 503.

On February 15, 2005, the plaintiff was seen again in the Orthopedic Clinic.  Her cast was removed.  She had mild-to-moderate swelling of her left ankle and limited range of motion.  She reported pain and throbbing when upright, but the throbbing was relieved with elevation.  An x-ray showed that the spiral fracture was healing.  She was placed back into a cast, told not to bear weight, and scheduled for a four week follow up appointment.  Id. at pp. 543-44.

On February 4, 2005, the plaintiff was evaluated by a physical therapist for neck pain and spasms in her upper thoracic area resulting from the motor vehicle accident.  The plaintiff reported hypersensitivity to lights and sounds and difficulty with short-term memory and

organizational skills.  The physical therapist documented that the plaintiff had decreased

cervicothoracic mobility and decreased upper extremity use.  She was scheduled for physical

therapy once a week for six to eight weeks to address those issues.  Id. at p. 486.  The physical

therapist wrote a letter to Mark Sanazaro, M.D., at the Mountain Family Health Center stating

that he felt the plaintiff's reports of phonophobia; photophobia; dizziness; difficulty with

concentration, memory, and attention to tasks; extreme fatigue; and difficulty caring for herself

could indicate a closed head injury.  He recommended evaluation and treatment from a

neurotrauma team.  Id. at p. 485.

On March 9, 2005, the plaintiff was seen at the Mountain Family Health Center by Dr.

Drapeau.  The plaintiff requested pain medications.  She stated that she was not able to sleep

because of her pain; was having issues with depression due to her inactivity; she felt like she was

going to have a nervous breakdown; and she did not feel like her Prozac was working.  Id. at p.

502.  She was diagnosed with depression and anxiety "worse" secondary to leg fracture.  She

was prescribed Vicodin.  Id. at p. 501.

The plaintiff returned to the Orthopedic Clinic on March 15, 2005.  Her cast was

removed.  She had mild swelling of her left ankle, limited range of motion, and was "quite

tender."  X-rays showed an unchanged alignment of the fibular fracture, evidence of healing

inferiorly, but no evidence of healing superiorly "where a small fracture fragment remains

interposed between the major fracture fragments."  She was placed in a walking boot, given

crutches, and instructed to advance weight bearing as tolerated.  She stated that she had a

headache and occasionally gets migraines.  She was scheduled for a follow up appointment in

eight weeks.  Id. at pp. 541-43.

6

The plaintiff called the Mountain Family Health Center on March 21, 2005, requesting narcotics and muscle relaxants.  She complained of headaches, slurred speech at times, and that light and noise hurt her head.  She stated that her physical therapist thought she may have a closed head injury.  She said that the Ultram and Flexeril help her headaches the most.  She was prescribed Ultram and Flexeril.  Id. at p. 500.

On April 5, 2005, the plaintiff called the Mountain Family Health Center because she needed a prescription to continue physical therapy for her cervical spine.  On April 6, 2005, she was informed that she needed to come in and complete a new "CICP application" so she could continue her physical therapy.  It was also noted that the plaintiff has "limited benefits for 6-7 PT visits" and that the physical therapist recommended that she be evaluated by the neurotrauma team when she gets on Medicaid.  Id. at p. 499.

On April 18, 2005, the plaintiff was seen by Dr. Drapeau for a "general check-up" at the Mountain Family Health Center.  The plaintiff reported being "shaky all the time" and having migraines "all the time."  She stated that the physical therapist wanted her to see a neurologist, and she asked for a referral to a neurologist.  She also wanted more medications because she had been out of her medications for one week.  She was taking Percocet, Vicodin, Ultram, Oxycontin, and Flexeril, but nothing for migraines.  It was noted that the plaintiff did not have a history of migraines, but the plaintiff reported having them since January 4, 2005.  Dr. Drapeau diagnosed the plaintiff with "chronic headaches, some migraine features but likely post traumatic and some component of depression"; chronic neck pain, whiplash injury; and questionable post concussion syndrome.  She increased the plaintiff's Prozac; prescribed Maxalt on a trial basis; gave the plaintiff an injection of Toradal for pain; referred the plaintiff to neurology; and

scheduled a follow up appointment for three weeks.  Id. at pp. 497-99.

On May 6, 2005, the plaintiff was seen at the Mountain Family Health Center complaining of shoulder pain secondary to her whiplash injury and ankle/foot pain.  She had been taking Excedrin, Flexeril, Percocet, and Vicodin.  She had run out of the Percocet and Vicodin, and she had decreased her dose of Prozac from 60 mg. to 40 mg. "on her own [secondary] to shaking."  She stated that she was no longer "weepy."  She said she felt helpless but not hopeless and reported that her depression symptoms had improved.  She had normal speech and affect; interacted appropriately; was alert; and was oriented in all spheres.  She was diagnosed with a left leg fracture, depression, and chronic neck pain.  She was prescribed Vicodin for pain.  Id. at 495-95.

The plaintiff was seen in the Orthopedic Clinic on May 17, 2005.  She stated that she was in unbearable pain and had been unable to advance her weight bearing to eliminate crutches over the last eight weeks.  She stated that she was still having chronic pain issues with migraines and head, neck, and shoulder pain.  She said she was taking up to eight Vicodin a day in addition to over-the-counter analgesics.  She was still wearing the boot and using crutches.  She continued to smoke.  The care provider documented that she was not in any acute distress; had no acute swelling; had tenderness to palpation of the tibia and malleolus; and had limited range of motion.  X-rays showed an increase in the amount of osteoporosis secondary to prolonged non-weight bearing status, a slowly healing distal fibular fracture, but no callous formation in the proximal portion of the fracture.  She was diagnosed with a slow healing fracture of the distal fibula.  She was encouraged to do gentle range of motion exercises with her ankle and apply some weight on it.  She was also encouraged to stop smoking.  She reported that she is requiring "so much

Vicodin"; it was "like candy"' but did not help her with her pain issues at all.  She was referred to a neurologist for evaluation of her migraines.  She was not able to be referred to a pain clinic because of insurance reasons.  She was scheduled for a CT in one month and a follow up appointment in six weeks.  Id. at pp. 539-40.

On May 31, 2005, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center.  She reported that she was in more pain because she was trying to progress from crutches to a cane.  She requested a refill of Flexeril and Vicodin.  She reported having headaches daily.  The doctor reported that she had slow speech.  She diagnosed the plaintiff with left leg pain secondary to delayed healing of fractures and chronic tension/migraine headaches associated with post traumatic neck pain.  The plaintiff was prescribed Vicodin and Ibuprofen.  Id. at 494-95.

The plaintiff had a CT of her left ankle on June 1, 2005.  The CT showed minimal healing, only superiorly, of the distal fibular fracture.   Id. at p. 538.

The plaintiff returned to the Orthopedic Clinic on June 21, 2005.  She had general tenderness to palpation around the lateral malleolus and the anterior ankle, but no swelling.  She had limited range of motion of the ankle.  She was assessed as having a delayed union of the left ankle fracture.  Physical therapy was recommended to increase range of motion and strength.  She was encouraged to bear weight to stimulate healing and to quit smoking.  A follow up appointment was scheduled for two months.  Id. at pp. 536-37.

On June 28, 2005, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center.  The plaintiff reported that she had gained 40 pounds since her accident and she was getting depressed even though she was still taking Prozac.  She also reported that her left leg

caused severe pain and sometimes felt numb and that she had daily headaches and neck tension, but the Maxalt helped the pain.  She requested refills of Vicodin, Flexeril, and Ibuprofen.  Dr. Drapeau observed that the plaintiff appeared depressed and diagnosed the plaintiff with "[d]epression not fully controlled"; chronic leg pain; and "migraine/tension mixed headaches." She prescribed Wellbutrin, Ibuprofen, Vicodin, and Flexeril.  Id. at p. 493.

The plaintiff had an MRI of her cervical spine on July 5, 2005.  The radiologist concluded that the plaintiff had (1) moderate to advanced C5-6 disc degenerative changes which produced mild central canal compromise, mild posterior displacement, and mild flattening of the ventral surface of the cord, mild posterior displacement of the C6 ventral rootlets, and moderate to advanced bilateral neural foraminal narrowing; (2) mild to moderate right uncovertebral degenerative changes at the C3-4 level which produced mild posterior displacement of the right C4 ventral rootlets; and (3) 7 and 14 mm left C7-T1-2 nerve root sheath cysts in the presence of intact left C8 and left T1 nerve roots.  Clinical correlation was advised as to whether or not the nerve root sheath cysts were incidental in nature or were symptomatic.  Id. at p. 489-90.

On July 6, 2005, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center.  The plaintiff reported that she had daily headaches; Maxalt helped the headaches; her eyes and head hurt; her left leg was still painful; and she was not crying all the time.  Dr. Drapeau documented that the plaintiff had a flattened affect and her neck muscles were tight bilaterally, but she could turn her head 41 degrees in each direction.  She diagnosed the plaintiff with "depression improving" and chronic headaches.  Id. at p. 492.

On July 7, 2005, an orthopedic surgeon, Steven Nadler, M.D., wrote a letter to Dr. Sanazaro at the Mountain Family Health Center.  He thanked Dr. Sanazaro for referring the

10

plaintiff to him.  He stated that he was in the process or ordering the plaintiff's medical records and x-rays and that he had ordered an MRI scan.  Id. at p. 523.

On July 12, 2005, the plaintiff saw Sheri Friedman, M.D., for a neurological consultation. The plaintiff reported that her neck began hurting immediately after her car accident and her headaches began soon after; her headaches have been the same every day since the accident; they begin with muscle tightness at the base of the skull, radiate to the front, then to a position behind her eyes bilaterally; she has mild photophobia and phonophobia; she had no prior history of chronic pain; although she has been on a number of medications to abort the headaches, she has not tried any preventative medications for her headaches; she has difficulty concentrating and problems with short-term memory due to difficulty concentrating; her memory is worse on the days that her headaches are worse; and she denies any numbness, tingling, or weakness.  The plaintiff was currently taking Prozac, Vicodin, Ibuprofen, Phenergan, Prevacid, and Maxalt.  She reported that she was smoking a half of a pack of cigarettes per day; was unemployed and divorced; and is under a significant amount of stressors, including financial, emotional, and social.  Id. at pp. 524-25.

Dr. Friedman documented that the plaintiff was alert, oriented, and in no apparent distress; the plaintiff was wearing a "boot type brace on her left foot"; when the boot was removed, there was no evidence of deformity, bruising, discoloration, or edema; the neurological examination was normal; the plaintiff's shoulder shrug and head turn was strong and symmetric; her muscle tone was normal and no abnormal movements were noted; she was 5/5 for strength in all muscle groups except for the left calf muscles "which [were] somewhat limited due to discomfort in this region"; she had a normal gait without instability; she had an appropriate

affect, an appropriate cognitive level, and a good fund of knowledge; and she had "immediate recall, short term and long term memory." Id. at pp. 525-26.

Dr. Friedman performed an examination and assessed that the plaintiff had "a whiplash injury which resulted in chronic muscle spasm" and was "most likely resulting in the chronic migrainous headaches." The plaintiff also had "some component of rebound associated with taking chronic daily abortive therapy." Dr. Friedman recommended that the plaintiff stop taking daily Vicodin, Ibuprofen, and other over-the-counter analgesics; stop taking Maxalt on a daily basis and reserve it for no more than twice weekly use; treat migraines acutely no more than twice a week to prevent rebound; begin taking a preventative headache medication such as Topamax, Neurontin, Elavil, Wellbutrin, or Cymbalta; begin physical therapy for muscle spasms related to soft tissue injury in the cervical region; and use medications for the spasms such as low-dose Flexeril, Zanaflex, and Lidocaine patches. Dr. Friedman opined that most of the plaintiff's complaints regarding short-term memory and concentration difficulties were associated with the chronic headaches, and that her headaches should be controlled before addressing those issues. Id. at p. 526.

The plaintiff was seen by Steven Nadler, M.D., on July 18, 2005, to "go over her two injuries." Dr. Nadler stated that the MRI of the plaintiff's cervical spine "reveals a disc herniation at C5-C6 with flattening of the ventral surface of the cord, displacing the C6 nerve root. There is bilateral advanced neural foraminal narrowing, and I have told Ms. Vanhanken that most probably, this is the cause of her symptoms and associated headaches, and this injury occurred from her accident in January of 2005." Dr. Nadler informed the plaintiff that there are several ways to treat her cervical spine injury. The conservative approach would include mild

medications, exercise, physical therapy, limitation of activities, and time.  Other options are an epidural steroid or nerve root injections.  Finally, he could refer her to a spine surgeon for surgical intervention.  The plaintiff chose the conservative approach with therapy and mild medications.  Dr. Nadler determined that, after review of the x-rays, the fibular fracture did not appear to be healed.  He told her she should consider surgery, including plating and bone grafting.  He noted that she did not have health insurance, so a "bone stimulator" was not an option at that time.  Id. at p. 737.

On July 27, 2005, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center for a follow up appointment to discuss laboratory results and medications.  The plaintiff reported that the neurologist wanted her off of migraine medications.  She wanted to change to either Neurontin or Topamax with Zanaflex at night.  She was prescribed Neurontin for her headaches.  Dr. Drapeau noted that the plaintiff reported decreased sensation in her left thumb and in the fifth finger on her right hand.  Id. at pp. 594-95.

The plaintiff was seen in the Orthopedic Clinic on August 5, 2005.  The care provider documented that the spiral fracture of the fibula had not healed and that the plaintiff is "a smoker and it was explained to her repetitively that this contributes to the nonunion."  The plaintiff was scheduled to return in six weeks for another x-ray and possibly surgery for placement of a plate and screws and a bone graft, but only if she stopped smoking.  Id. at p. 535.

On August 17, 2005, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center for review of her neurological consultation and to discuss if she should take something other than Neurontin.  The plaintiff stated that the Neurontin was not helping her headaches and was upsetting her stomach.  She rated her pain as a "5" at the time, but she had

taken Ibuprofen 1½ hours prior.  The Neurontin was discontinued and Amitriptyline (Elavil) was prescribed.  An examination was not performed.  Id. at p. 592.

On September 12, 2005, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center.  The plaintiff reported that she was going "on an extended trip" beginning September 13, 2005, and "needs refills of Vicodin, Flexeril, and Ibuprofen."  The plaintiff wanted to discuss either increasing the Vicodin or changing medications.  The plaintiff reported that the orthopedic doctor was recommending "total ankle replacement" in October; her headaches were less severe but still daily; and she had photo and phono sensitivity.[4]  Dr. Drapeau documented that the plaintiff had slightly diminished strength (4/5) in her upper extremities, and her neck was non-tender.  She diagnosed the plaintiff with "chronic mixed headache disorder" and chronic left ankle pain "non union of fracture."  Id. at p. 591.

On October 4, 2005, the plaintiff was seen in the Orthopedic Clinic.  The plaintiff reported that she had stopped smoking in September.  She was wearing an ankle brace and walking with a cane.  She reported that she experienced increased pain and swelling when on her feet.  She stated that she was taking Motrin, Flexeril, occasional Vicodin, Prozac, Prevacid, and Maxalt for migraines.  The care provider documented that the plaintiff was not in any acute distress; had a supple neck with full range of motion; had tenderness to palpation of her distal fibula; and had limited range of motion.  She was assessed to have a non-union of her left distal fibula.  She was scheduled for an open reduction and internal fixation of the left distal fibula with a bone graft from her left hip.  Id. at pp. 532-34.

---

[4]There is no evidence in the record that the orthopedic doctor recommended a total ankle replacement.

The surgery was performed on October 13, 2005.  The plaintiff was discharged from the hospital on the same day.  Id. at pp. 530-32.

On October 18, 2005, the plaintiff was seen at the Mountain Family Health Center to have her incision checked.  The plaintiff was using a cane and reported that she was in a lot of pain.  She was prescribed Ibuprofen, Flexeril, and Percocet.  Id. at p. 590.  She was seen again on October 20, 2005, to recheck the wound.  She was in no apparent distress.  Id. at p. 588.

On October 26, 2005, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center "to have a form filled out."  The plaintiff complained of daily headaches, but they were not as severe as before.  Dr. Drapeau noted that the plaintiff's ankle was not swollen and the wound was intact.  Dr. Drapeau discontinued the Prozac and prescribed Cymbalta "for headache suppression."  Id. at p. 589.

The plaintiff was seen in the Orthopedic Clinic on October 28, 2005, and placed in a walking cast with instructions to return in one month.  Id. at p. 530.  She was seen again on November 29, 2005.  The care provider noted that when the operative procedure was performed, the fracture site was not a nonunion, but was solidly unified.  The bone graft was placed "however, just for regeneration of any possible area."  The plaintiff stated that her pain was unchanged, and she was using a cane.  She was assessed to have a well-united fracture of the left distal fibula.  She was scheduled for physical therapy to increase the strength and range of motion of her ankle.  No pain medication was dispensed.  Id. at pp. 528-29.

On January 16, 2006, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center for a "medication review."  The plaintiff requested refills of Ibuprofen, Flexeril, and Phenergan.  She reported mood changes; on some days she felt very depressed; and she still

15

had daily headaches that "ease off by evening." Dr. Drapeau documented that the plaintiff was alert; had decreased range of motion in her neck; her neurological examination was within normal limits; and was walking with a cane. Id. at p. 587. The remainder of this progress note is missing.[5]

On March 28, 2006, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center "to discuss medications." The plaintiff requested refills of Ibuprofen, Flexeril, and Phenergan. She also requested "a note that she has not been released to go back to work for Social Services." She reported that her ankle was still swollen and she experienced daily pain; she had headaches every other day; she had upper back and neck spasms; and the Flexeril helps her upper back and neck spasms. Dr. Drapeau documented that the plaintiff was alert and in no apparent distress. Id. at p. 585. The remainder of this progress note is missing.

In March 2006, the plaintiff also was seen at the Mountain Family Health Center in Black Hawk, Colorado. Id. at pp. 568-81. She was seen several times for issues relating to menopause. Id. at pp. 578-85. However, pages of the care providers' notes are missing from the record. It is clear that the plaintiff remained on Ibuprofen, Phenergan, Flexeril, Prozac, and Maxalt. Id. at p. 582. On April 24, 2006, she requested and received Vicodin for dysmenorrhea. Id. at p. 581. On June 6, 2006, the plaintiff had breast biopsies and called to request that Dr. Drapeau give her something for pain. She was taking Ibuprofen daily for chronic pain and Flexeril as needed for neck spasms. Vicodin was not helping. Percocet was prescribed. Id. at p. 580. She received a refill of Diazapam, Ibuprofen, and Vicodin on July 24, 2006. Id. at p. 579.

---

[5]Beginning January 16, 2006, and ending July 30, 2007, the records from the Mountain Family Health Center are missing pages and are out of order. Id. at pp. 568-87.

On August 2, 2006, a registered nurse at the Mountain Family Health Center in Nederland noted that the plaintiff had a pelvic examination the day before; the nurse called the plaintiff to relay her lab results; the plaintiff answered the phone sounding awful and stating that she had fever, chills, and left abdominal pain since her examination; the plaintiff was crying and saying that she hurts too bad to call the doctor; and the nurse told the plaintiff to go to the emergency room.  The next day, a care provider called the plaintiff to check on her.  The plaintiff reported that she did not go to the emergency room; she stayed home and took a friend's Erythromycin; and she felt 95% better.  The care provider recommended that she come in to be seen, but the plaintiff stated she would if she did not get better.  Id. at p. 578.

On September 25, 2006, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center in Nederland to discuss medication issues.  The plaintiff complained of daily headaches.  She was walking with a cane.  Dr. Drapeau documented that the plaintiff's neck was very tight; she could turn it 45 degrees to the right and 60 degrees to the left; her neurological exam was negative; she had chronic tension headaches; and her depression was not fully controlled and was associated with chronic pain.  Dr. Drapeau refilled the plaintiff's prescription for Vicodin and Diazepam; increased the plaintiff's Prozac dosage; and scheduled a follow up appointment for three months.  The plaintiff requested more Vicodin and Valium on October 11, 2006, but was told it was too early to refill these prescriptions.  Her Flexeril and Ibuprofen were refilled.  Id. at pp. 576-77.

On November 15, 2006, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center in Nederland for cold symptoms and abnormal vaginal bleeding.  Dr. Drapeau noted that the plaintiff was a smoker and emphasized the risk of smoking.  Id. at p. 575.

17

On January 10, 2007, the plaintiff was seen by Dr. Drapeau at the Mountain Family Health Center in Nederland to discuss her medications.  The plaintiff reported that Zanaflex was helping her right shoulder, neck, and upper arm spasms and pain, and she was having fewer headaches.  Dr. Drapeau documented that the plaintiff was not in any apparent distress; had fair range of motion in her neck; had chronic neck pain that was improved on Zanaflex.  Id. at p. 574. The rest of the progress note is missing from the record.

The plaintiff called the Mountain Family Health Center in Nederland several times between January and March 2007 requesting early refills for Vicodin but was refused because only Dr. Sanazaro could write the prescription due to a Pain Contract.  Id. at pp. 571-72.  On May 3, 2007, the plaintiff requested that her Ibuprofen, Flexeril, Phenergan, and Vicodin prescriptions be refilled by the next day because she was going out of town.  Id. at p. 570.

On June 28, 2007, the plaintiff was seen at the Mountain Family Health Center in Nederland for medication refills.  The care provider noted that the Nederland clinic was closing. It was also noted that the plaintiff was alert and was not in any apparent distress.  She was diagnosed with chronic neck pain and prescribed Vicodin, Amitriptyline, and Clonazepam.  Id. at p. 569.

On October 3, 2007, the plaintiff was seen at the Mountain Family Health Center in Black Hawk for completion of a Med 9 form.  She reported mid c-spine pain radiating past her right upper arm to her elbow.  She complained of numbness in both hands; severe short term memory loss, increased sleep, decreased motivation, and increased sadness.  The care provider documented that the plaintiff was alert and in no apparent distress, but had a flat affect; she had c-spine spasms bilaterally; her range of motion was markedly decreased in all directions; and she

had bilateral trapezius spasms.  The form was completed.  Id. at p. 568.

On March 12, 2008, Dr. Drapeau completed an examination form for the Colorado Department of Human Services.  She checked a box which states that she finds that the plaintiff "has been or will be disabled to the extent [she] is unable to work at any job for a total period of six (6) or more months due to a physical or mental impairment that is disabling."  Id. at p. 550. She stated that the diagnosis "pertaining to disabilities" was "cervical spine stenosis and degenerative disc disease depression."  When asked what symptoms need to be alleviated to allow the plaintiff to become employable, Dr. Drapeau wrote "decreased pain."  Id. at p. 551.

On July 10, 2008, Alan Ketelhohn, M.D., completed a "Physical Residual Functional Capacity Assessment" regarding the plaintiff.  Dr. Ketelhohn opined that the plaintiff could occasionally lift and/or carry (including upward pulling) 20 pounds; could frequently lift and/or carry (including upward pulling) 10 pounds; could stand and/or walk (with normal breaks) a total of six hours in an eight hour workday; could sit (with normal breaks) for a total of six hours in an eight hour workday; could push and/or pull (including operation of hand and/or foot controls) for an unlimited amount of time other than as shown for lift and carry limitations; had no postural limitations (climbing, balancing, stooping, kneeling, crouching, or crawling); had no manipulative limitations (reaching, handling, fingering, or feeling); and should avoid concentrated exposure to noise, but could have unlimited exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. When asked to explain how the evidence supports his conclusions regarding lifting, carrying, standing, walking, sitting, pushing, and pulling, Dr. Ketelhohn wrote "persistent extreme pain in the ankle thought to be due to non-union and had operative evaluation which showed solid

19

[fracture] healing.  + [cervical spine] xray with [degenerative disc disease] and stenosis."  When

asked to discuss symptoms alleged by the plaintiff which were not previously discussed and

whether they were attributable to a medically determinable impairment and were consistent with

the evidence, Dr. Ketelhohn wrote:

> Limps and difficulty sitting per CR.  Lets dogs out, RV, rides,
> drives, dishes, own personal care, light cooking and helps with HH
> chores.  Shops, rt handed.  One to two blocks.  Cane, brace.  Eats
> out a lot.  Uses NSAIDs narcotic, Flexeril and migraine medicines
> with some help.

Id. at pp. 461-68.

On May 15, 2008, William Morton, Psy.D., performed a consultative psychological

evaluation of the plaintiff.  Dr. Morton reviewed the plaintiff's psychosocial history and

performed a mental status examination.  The plaintiff reported headaches, muscle tension, and

neck and leg pain.  She reported a head injury from the January 2005 motor vehicle accident

"involving a loss of consciousness of unknown duration."  She was currently taking Tizanidine,

Protonix, Phenergan, Ibuprofen, Flexeril, Vicodin, Topamax, Maxalt, Lidoderm Patch,

Clonazepam for muscle tension, Amitriptyline as a sleep aid, and Prozac which had "a positive

effect" and no adverse effects.  She reported that she lived with a friend; was able to drive short

distances; required "transportation assistance" to obtain medical care; required "prompting

assistance" to take her medications; gets "almost no exercise"; sleeps 12-14 hours per day;

prepares simple foods such as a grilled cheese sandwich; is not able to clean the home or

participate in outside work; can participate in laundry care; is able to groom herself; cannot

manage her finances without assistance; and is not able to control impulses related to spending

money.  The plaintiff also reported sleep disturbance; appetite disturbance; irritability;

tearfulness; loss of concentration; loss of motivation; little or no energy; fatigue; sadness;

anhedonia; social isolation; feelings of worthlessness and hopelessness; and occasional suicidal

thoughts.  Id. at pp. 675-76.

Dr. Morton documented that the plaintiff's nutritional status appeared adequate and her

hygiene appeared appropriate; she had normal posture, locomotion, and gait; she evidenced no

difficulty with extended sitting or rising from a seated position; her responses were normal and

spontaneous; her interaction was comfortable and normal; her verbal expressive ability was

within normal limits; her affect was restricted but her mood was stable; her insight and impulse

control was intact and adequate; she was oriented to time, place, and person; she was alert and

able to spell "world" forward and backward; she performed Serial-3's without error up to 40 and

Serial-7's without error down to 51; her thinking ability was within normal limits; her fund of

knowledge was fair; her judgment and reasoning were adequate; and she did not have any

indications of significant memory impairment.  Dr. Morton assigned her a GAF of 50-55.  He

concluded that the plaintiff has mild mental limitations in regard to remembering and

understanding instructions, procedures, and locations; moderate mental limitations in regard to

carrying out instructions; minimal limitations in regard to maintaining attention, concentration,

and pace; minimal limitations in regard to interacting appropriately with supervisors, co-

workers, and the public; and mild limitations in regard to using good judgment and responding

appropriately to changes in the work place.  Id. at pp. 676-77.

On June 18, 2008, the plaintiff saw Dr. Drapeau because she wanted to decrease the

medications she was taking.  She did not feel that the Flexeril did "anything for her."  She

reported that her neck pain was the same, but now she had intermittent pain in both upper arms

and parathesias in her fourth and fifth fingers of both hands.  Dr. Drapeau documented that the plaintiff's leg did not heal and she is still in chronic pain.  She also documented that the plaintiff was in no apparent distress; her c-spine had decreased motion in all ranges; and there was a "flattening of the curves and spasm bilaterally."  Id. at pp. 709-10.

On August 11, 2008, Greg Feinsinger, M.D., performed a consultative physical examination of the plaintiff.  The plaintiff reported that since the motor vehicle accident, she has had pain and loss of range of motion in her cervical area; intermittent numbness of her fourth and fifth fingers; constant headaches from the cervical injury; and more severe "migraine" headaches that cause her to go to bed for a short period of time and are often associated with nausea and blurred vision.  She also reported chronic left ankle pain related to an ankle fracture, low back symptoms, and significant memory problems.  She stated she was on Protonix, Amitriptyline, Prozac, Flexeril, Vicodin, Clonazepam, Promethazine, Ibuprofen, Zanaflex, Maxalt, and Topamax.

Dr. Feinsinger reviewed the plaintiff's medical records and examined her.  He found her to be pleasant and cooperative, but somewhat groggy and sedated.  He documented decreased extension of the cervical spine as well as turning to the left.  He found that her strength, sensation, and reflexes were normal in her upper extremities; some decreased lumbar range of motion, decreased dorsiflexion of the left ankle; and that she walked with a moderate limp which she attributed to pain in her left ankle.  Dr. Feinsinger found that the plaintiff had pre-existing degenerative disease found on x-rays taken soon after the motor vehicle accident; chronic cervical pain with minor bilateral upper extremity radicular symptoms; chronic daily headaches resulting from the neck injury; chronic memory problems related to her headaches and multiple

22

medications; chronic left ankle pain; and chronic low back pain.  He stated that she is over-

medicated and "undoubtedly has some drug interactions due to her polypharmacy."  He

concluded that she could not sit for more than 15 minutes at a time; could probably stand for 15

minutes at a time; would have difficulty moving about for extended periods of time due to pain

and headaches; was limited to carrying and lifting five pounds; would not be able to travel; and

would not be able to engage in any type of gainful employment.  He stated that "with some

medication adjustments she would be more functional both physically and emotionally."  Id. at

pp. 679-80.  Dr. Feinsinger ordered an x-ray of the plaintiff's lumbar spine which showed

"normal."  Id. at p. 681.

On August 22, 2008, the plaintiff saw Dr. Drapeau for an upper respiratory infection, a

medication check, a blood draw, and to have paperwork completed for Social Security.  The

plaintiff reported chronic neck pain that radiates to her arms; numbness and decreased strength

and coordination in her fingers; headaches; short term memory loss; loss of balance when

walking; difficulty sleeping; and a left ankle that swells and hurts if she stands too long.  Dr.

Drapeau noted that the plaintiff was not in any apparent distress during the visit and had only

moderately reduced range of motion.  Id. at pp. 707-708.

Dr. Drapeau completed a "Revised Medical Assessment of Ability To Do Work-Related

Activities (Physical)" on August 22, 2008.  She indicated that the plaintiff could occasionally

lift, but never carry up to 10 pounds; could sit for 15 minutes without interruption for a total of

two hours in an eight hour work day; could stand for 15 minutes without interruption for a total

of one hour in an eight hour work day; could walk for 15 minutes without interruption for a total

of one hour in an eight hour work day; would be "lying down or changing positions" the rest of

the eight hour day; "also has chronic left ankle pain from a non-union of a fracture 1-19-05" which is shown on plain films and a CT scan; can occasionally reach, handle, feel, push, and pull with both hands; can never finger with either hand; can operate foot controls frequently with the right foot but never with the left foot; has decreased sensation and fine motor control in the fingers of both hands due to bilateral cervical radiculopathies; has chronic ankle pain that prohibits her from using a foot pedal; can never climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl; has balance problems from a neck and head injury in 2005; can never be exposed to unprotected heights, moving mechanical parts, humidity and wetness, extreme cold, extreme heat, or vibrations; can occasionally be exposed to dust, orders, fumes, and pulmonary irritants, can occasionally operate a motor vehicle; can be exposed to moderate noise (office); suffers increased musculoskeletal pain with extremes of temperature and humidity; cannot perform activities like shopping; cannot travel without a companion for assistance; can ambulate without using a wheelchair, walker, two canes, or two crutches; cannot walk a block at a reasonable pace on rough or uneven surfaces; can use standard public transportation; can climb a few steps at a reasonable pace with the use of a hand rail; can prepare a simple meal and feed herself; can care for her personal hygiene; and cannot sort, handle, or use paper/files. Id. at pp. 684-88; 714-718.

On September 19, 2008, the plaintiff was seen by Dr. Drapeau. The plaintiff was having a mammogram done that morning and she needed medication refills. Dr. Drapeau noted that the plaintiff was not in any apparent distress. Id. at pp. 705-706. The plaintiff was seen by Dr. Drapeau again on October 31, 2008, to talk about her mammogram results. She was worried because her mother has advanced breast cancer. Dr. Drapeau documented that the plaintiff was

in no apparent distress; was alert and oriented; her affect was normal; she denied hopelessness, mood swings, and suicidal ideation; and she was tearful at times. Id. at pp. 703-704.

On January 9, 2009, the plaintiff was seen by Dr. Drapeau because the plaintiff was traveling to Florida for three weeks and needed refills on her pain medications. Although Dr. Drapeau documented that the plaintiff "is very tired and fatigued still," she also stated that the plaintiff was alert, oriented, and in no apparent distress. Id. at pp. 701-702.

The plaintiff was seen by Dr. Drapeau on March 16, 2009, for an upper respiratory infection. Dr. Drapeau noted that the plaintiff was not in any apparent distress and was a smoker. Id. at pp. 699-700. The plaintiff was seen by Dr. Drapeau again on March 30, 2009, for the infection. Dr. Drapeau noted that the plaintiff was not in any apparent distress; was alert and oriented; and did not exhibit any unusual anxiety or depression. Id. at pp. 697-98.

On April 24, 2009, the plaintiff was seen by Dr. Drapeau because the plaintiff had taken her cat to the veterinarian that morning and the cat bit her hand. Dr. Drapeau noted that the plaintiff was not in any apparent distress. Id. at pp. 695-96.

On August 19, 2009, the plaintiff saw Dr. Drapeau for medication refills and "to discuss disability form from attorney." The plaintiff stated that she had memory and concentration difficulties; could not balance her check book; had short-term memory loss; gets very anxious in the grocery store and "often leaves without buying anything"; and had recurrent swelling and chronic pain at her ankle incision site. Dr. Drapeau noted that the plaintiff was not in any apparent distress; was alert and oriented; did not have any unusual anxiety or evidence of depression; and had "[p]atchy swelling on both sides of incision overlying [left] fibula." Id. at pp. 734-35.

On August 25, 2009, the plaintiff saw John Radloff, PA-C, for a urinary tract infection. The care provider documented that the plaintiff was not fatigued; had back pain and bone/joint symptoms; was not in any acute distress; was overweight; did not have edema in her extremities; and did not have any unusual anxiety or evidence of depression.  Id. at pp. 731-33.

On November 16, 2009, Dr. Drapeau completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)."  Dr. Drapeau opined that the plaintiff had marked inability to understand and remember simple instructions, carry out simple instructions, understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, and a moderate inability to make judgments on simple work-related decisions due to her short-term memory loss.  She further opined that the plaintiff has a marked inability to interact appropriately with the public, supervisors, and co-workers, and a marked inability to respond appropriately to usual work conditions and to changes in a routine work setting because "personal interactions with people other than her husband cause sever anxiety and panic attacks."  Dr. Drapeau stated that the plaintiff's impairment also affected her ability to run errands, shop, and drive, and that the impairments were first present in May 2005. Id. at pp. 720-22.

On November 25, 2009, the plaintiff saw Dr. Drapeau for completion of a "Colorado Department of Human Services Med-9 Form."  Dr. Drapeau checked the box that stated she found the plaintiff disabled to the extent she is unable to work at any job due to a physical or mental impairment.  Id. at p. 723.  Dr. Drapeau documented that the plaintiff was in no apparent distress; was alert and oriented; and did not have any unusual anxiety or evidence of depression. Id. at p. 727.

On December 16, 2009, a hearing was held before the ALJ. Id. at pp. 181-229. The plaintiff was 49 years old. Id. at p. 188. She testified that she was taking Vicodin and Ibuprofen for pain; Flexeril to relax her muscles; Protonix and Promethazine for her stomach; and Prozac for depression. Id. at p. 189. The plaintiff has not had and does not plan to have any further operative procedures. Id. at p. 190. She sees Dr. Drapeau, a family practice physician, for all of her health issues, including her mental health issues. Id. at pp. 190-91.

Dr. Michael Gurvey, and orthopedic surgeon, testified as a medical expert. Id. at pp. 191, 348. Based on his review of the record, Dr. Gurvey identified five medically determinable impairments established by acceptable clinical techniques within his specialty: (1) a history of chronic neck pain since the motor vehicle accident of January 4, 2005, which is caused by degenerative disc disease and was present prior to the accident; (2) a history of low back pain; (3) a fracture of the left distal fibula on January 19, 2005, and status post bone graft for a suspected non-union which was not present at the operative time; (4) a history of depression; and (5) a possible habituation to pain medications such as Vicodin. Id. at p. 193.

Dr. Gurvey opined that the plaintiff could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit for an unlimited amount of time; stand and walk for an unlimited amount of time from January 4, 2005, to January 19, 2005; stand and walk for two to four hours in a six hour day from January 19, 2005, to May 2005; stand and walk for four to six hours in an eight hour day with normal breaks from May 2005, to November 29, 2005; stand and walk for six hours in an eight hour day with normal breaks from November 29, 2005, to present; could occasionally push and pull with her left foot from January 2005 to December 2005; never operate foot controls with the left foot from January 2005 to December 2005; never climb

ladders, scaffolds, or ropes from January 2005 to December 2005; occasionally climb ramps

from January 2005 to December 2005; never balance from January 2005 to December 2005;

occasionally to frequently stoop, kneel, crouch, and crawl from January 2005 to December 2005;

manipulate without limits from January 2005 to current; occasionally be exposed to heights and

machinery from January 2005 to December 2005; and be exposed to cold, heat, wetness, and

humidity without limitation from January 2005 to current.  Id. at pp. 198-202, 204.

Dr. Gurvey further opined that from January 2006 to current, the plaintiff could sit, stand,

and walk six out of eight hours with normal breaks; never climb ladders or scaffolds; frequently

climb stairs and ramps; frequently stoop, kneel, crouch, and crawl; and never balance.  Id. at pp.

202-204.

Dr. Gurvey stated that there was no basis in the medical records for Dr. Drapeau's

opinion that the plaintiff could sit, stand, and walk for only 15 minutes or the manipulative,

postural, and environmental limitations.  Id. at pp. 204-205.  When asked specifically about Dr.

Drapeau's notes that state the plaintiff has pain in both arms, paresthesias, decreased range of

motion in her cervical spine, and neck pain, Dr. Gurvey testified that those were based on

subjective complaints of the plaintiff, not on objective findings such as a neurological

assessment, neuromuscular examination, or x-rays.  Id. at pp. 206-207; 221-222, 225.  He further

testified that there is no absolute direct correlation between MRI results and clinical

manifestations; the plaintiff's MRI results do not definitively show she had nerve compression;

and the plaintiff has not had any abnormal objective neurological findings.  Id. at pp. 208-10.  He

testified that Dr. Feinsinger's opinion regarding the plaintiff's neck issues was problematic

because his physical examination consisted of a finding that the plaintiff was groggy and

sedated; the cervical spine had decreased extension, and the neurological examination was normal.  Id. at pp. 223-24.  He also found Dr. Feinsinger's opinion regarding the plaintiff's ankle and lower back complaints problematic because Dr. Feinsinger's objective physical findings were very limited.  Dr. Feinsinger noted a decreased lumbar spine range of motion and decreased dorsiflexion of the left ankle, but he "doesn't even measure it."  Id. at p. 224.

On February 1, 2010, the plaintiff saw Dr. Drapeau for medication refills.  She also requested that Dr. Drapeau write a letter concerning her disabilities.  Dr. Drapeau documented that the plaintiff was in no apparent distress; was alert and oriented; had a normal affect; was not anxious; and was tearful at times.  Id. at pp. 739-40.

On February 14, 2010, Dr. Drapeau wrote a letter "to clarify some points regarding Ms. Van Hanken's disabilities."  She stated:

> 1.  Neck pain
> On 7-5-05, a cervical spine MRI showed moderate to severe degeneration at C5-6 with mild stenosis of the central canal impinging on the spinal cord and moderate to advanced bilateral neural foraminal narrowing.  This would put pressure on the nerves as they exit the spinal column which will cause pain, numbness and weakness in both arms.  Although Ms. Van Hanken has not had another MRI due to financial issues, it is safe to assume that these degenerative changes have gotten worse over the last 4 ½ years.  Lifting more than a small amount, pushing, pulling or working with her arms overhead would cause traction on the compromised nerves, causing more pain.
>
> 2.  Ankle pain
> On 1-19-05, Ms. Van Hanken broke her L fibula.  This was a spiral fracture that extended into the ankle joint.  Xrays done 2-15-05, 3-15-05, 5-17-05 and 6-1-05 showed the fracture had only minimal healing after 6 months.  The patient had to be imobilized [sic] for many more months.  There is research that shows that patients with ankle fractures, particularly complex ones, can have chronic ankle pain.  It is also well established that a fracture that extends into a joint will make that joint prone to arthritis.  The pain from either of

these problems will make it difficult for Ms. Van Hanken to stand for prolonged periods or walk very far.

3.   Depression, memory loss
Ms. Van Hanken has suffered depression and short term memory loss for years.  On 3-17-05, her physical therapist recommended she see a neurotrama [sic] therapist for these symptoms.  On 7-17-05, her neurologist suggested she be evaluated by a neuropsychiatrist to evaluate these symptoms, but she could not afford it.  Depression can also affect concentration.  Difficulty with concentration and short term memory makes it difficult to keep focused on a task.

Id. at p. 742.

On February 18, 2010, a supplemental ALJ hearing was held.  Id. at pp. 85-180.  Dr. Gurvey testified that Dr. Nadler's notes from the plaintiff's July 18, 2005, visit do not change the opinions he stated at the hearing on December 16, 2009, because Dr. Nadler's diagnosis and treatment recommendations regarding the plaintiff's leg fracture were appropriate at the time; the MRI taken of the plaintiff's c-spine in July 2005 showed a bulge at C5-6 with a mildly displaced root; and the MRI study needs to be correlated with the objective physical findings and other studies that were done.  Id. at pp. 90-93.  Dr. Gurvey further testified that the opinions he stated at the hearing on December 16, 2009, were not changed by Dr. Drapeau's letter dated February 14, 2010, because her letter lacked objective findings regarding her summarization of the plaintiff's condition.  Id. at pp. 93-107.

The plaintiff testified that she does not see a psychologist, psychiatrist, counselor, or therapist for her mental health treatment for financial reasons.  Id. at p. 108.  She is in the Colorado Indigent Care Program which does not cover mental health treatment.  Id. at p. 115. She was taking Prozac at the time of the hearing.  Id. at pp. 108-109.  She testified that she had anxiety and panic attacks in 2004 when she left her husband of 30 years.  The anxiety and panic

attacks got better until she had her motor vehicle accident.  Now she does not "go shopping very

often because there's too many people there.  I don't really do anything because of it.  I just

don't want to do anything."  Her depression is worse now because she does not go anywhere.

She does not want to get out of bed on some days.  Every six or eight months she has a "really

bad attack" where she "just freak[s] out and [cries] and basically hide[s]."  Id. at p. 113.

Nancy Winfrey, Psy.D., testified as an expert.  Id. at p. 115.  Dr. Winfrey testified that

based on her review of the record, the plaintiff has two medically determinable impairments that

are established by acceptable clinical techniques within her field of specialty as a psychologist:

(1) major depressive disorder, recurrent, moderate; and (2) post-traumatic stress disorder.  Id. at

p. 117.  She rated the plaintiff's activities of daily living at a moderate degree of limitation.  She

found some limitations with driving, needing reminders for medication, and some money

management; no limitations with social functioning; and mild limitations with concentration,

persistence, and pace.  She stated that the plaintiff had no limitations regarding simple

instructions and mild limitations regarding complex instructions.  Id. at pp. 118-20.

Dr. Winfrey was questioned about the difference between her opinion and the "Medical

Source Statement of Ability to do Work-Related Activities (Mental)" completed by Dr. Drapeau

on November 16, 2009.  Dr. Winfrey stated that she did not find any support in the medical

records for Dr. Drapeau's opinion.  Dr. Winfrey found that the medical records did not contain

adequate mental health information.  The Psychodiagnostic Evaluation performed by Dr. Morton

on May 15, 2008, did not show short-term memory loss as indicated by Dr. Drapeau.  To the

contrary, the plaintiff did well on her mental status examinations.  Id. at pp. 120-21.  Dr. Winfrey

did not agree with Dr. Drapeau's finding that the plaintiff had marked social limitations because

the record did not support severe anxiety and panic attacks.  Id. at pp. 121-22.  Dr. Winfrey stated that, although the Mountain Family Health Center notes contained some references to the plaintiff's mental health, they were primarily focused on the plaintiff's medical health.  Id. at pp. 123, 126-27.

The plaintiff testified that her headaches, memory loss, and "confusion and dealing with people" are what keeps her from working.  She stated that she has a headache every day; the headache is typically an eight on a scale from one to ten;[6] she takes medicine and it goes away; when she is exposed to bright lights, she gets the headache again; she tries to lie down in a dark room to make the headaches go away; sometimes her headache is a ten until the medicine takes effect, then it will go down to an eight and stay there most of the day unless she is exposed to loud noises.  Id. at pp. 144-45.  Since January 2005, the plaintiff's entire day is spent treating her headaches.  Id. at p. 146.  She has to lie down two to four times every day for one to three hours. Id. at p. 156.

The plaintiff stated that her memory loss problems are that she cannot remember where she put an important piece of paper; she cannot remember halfway through a sentence what she was talking about; and she has to have people help her remember to take her medicine so that she does not "get too much in pain."  Id. at p. 148.  She lives with a man who takes her to all of her doctor appointments; makes sure she takes her medicines; reminds her of things she needs to do; goes grocery shopping for her or with her; and helps her with the laundry.  She can make a grilled cheese sandwich "once in a while, and [she] burns it."  Id. at p. 149.  She drives four

---

[6]The ALJ explained that zero means an absence of pain and ten is the worst kind of pain imaginable, is the kind of pain that would make you think about ending your life just to stop the pain, and is so bad you would "have to be in an emergency room."  Id. at p. 145.

miles twice a week to the store to "grab a half gallon of milk or something."  Id. at p. 150.  Her

confusion is "hand in hand" with her memory loss; she is confused all of the time; and people

have to tell her things two or three times so she "can work it out in [her] head to figure out

exactly what's needed."  Id. at p. 151.

The plaintiff stated that she does not like to deal with people.  She does not have any

friends; she has no company in her home; she does not interact with anyone except her

roommate; and it gives her a headache to interact with his "people."  Id.  She sometimes drives

to see Dr. Drapeau, which is five miles from her home.  She closes her eyes and sits in the corner

in order to handle the people in the doctor's office.  Id. at p. 152.

The plaintiff testified that her left leg hurts all of the time; her ankle hurts all of the time;

the hip where the bone was grafted from is numb; she has cramping in her right leg because its

getting used more than the left leg; her shoulders "are like rocks all of the time"; she wears "a lot

of derm patches on them to try to loosen them up a little bit"; and she has numbness in her

fingers that extends into both arms.  Id. at pp. 152-53.  When asked what level of pain she was

experiencing during the hearing in her left leg on a scale of one to ten, she stated that her leg was

numb so she couldn't "really feel any pain."  She stated that her leg was numb because "I've

been sitting--I've been just, you know, its cold."  She said she feels pain 90 percent of the time;

the pain is usually an eight or a nine; the pain has been this strong and this frequent since the

surgery in 2005.  She also has experiences ankle pain all of the time on a level of eight or nine

and has experienced this pain since her cast was removed two and a half years ago.  Id. at pp.

153-54.

The plaintiff described her neck symptoms as "[i]t just tightens up and goes up to the

bottom of my skull"; her arms go numb if she rubs it; and "[i]ts like a headache that wants to be there but not." When her attorney asked her if it was "constant shooting," she said yes, "[m]ostly constant." Her attorney asked if the constant shooting goes into her arms, and she replied that it does. Id. at pp. 155-56.

The plaintiff stated that a gallon of milk is "almost too heavy" for her to carry; she has to lift the gallon with both hands; she can only carry her purse; she can sit for approximately an hour; she can stand for 15 minutes; it hurts her to twist and bend; she cannot hold her arms up "to do much of anything" because they get "tired really, really easily up in my shoulder areas"; she cannot reach over her head "[b]ecause it hurts down in my spine down towards my back, middle part"; reaching forward hurts the muscles in her right neck and shoulder; she has had difficulty gripping for two to three months because her fingers go numb "from [her] shoulders and neck" at least once or twice a day, "maybe more"; she cannot get up off the floor because her "leg won't push [her] up and [her] grip won't pull [her] up." Id. at pp. 159-162.

In response to questions by her attorney, the plaintiff stated that she had problems focusing, staying on task, and finishing; could not "read something with understanding" because it gave her a headache and made her eyes hurt; is "pretty helpless and worthless and just I feel like nothing"; sometimes "I tell my guy to just shoot me and put me out of my misery"; and is "always in a panic because [she is] very fearful of getting hurt again, of falling, of somebody coming and robbing me." Id. at pp. 162-63.

## II.  STANDARD OF REVIEW

Review of the Commissioner's disability decision is limited to determining whether the ALJ applied the correct legal standard and whether the decision is supported by substantial

evidence.  Hamilton v. Secretary of Health and Human Services, 961 F.2d 1495, 1497-98 (10th

Cir. 1992); Brown v. Sullivan, 912 F.2d 1194, 1196 (10th Cir. 1990).  Substantial evidence is

evidence a reasonable mind would accept as adequate to support a conclusion.  Brown, 912 F.2d

at 1196.  It requires more than a scintilla but less than a preponderance of the evidence.

Hedstrom v. Sullivan, 783 F. Supp. 553, 556 (D. Colo. 1992).  "Evidence is not substantial if it is

overwhelmed by other evidence in the record or constitutes mere conclusion."  Musgrave v.

Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992).  Further, "if the ALJ failed to apply the correct

legal test, there is a ground for reversal apart from a lack of substantial evidence."  Thompson v.

Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993).  Although a reviewing court should meticulously

examine the record, it may not reweigh the evidence or substitute its discretion for that of the

Commissioner.  Id.

## III.   THE LAW

A person is disabled within the meaning of the Social Security Act only if his physical

and mental impairments preclude him from performing both his previous work and any other

"substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2).  "When

a claimant has one or more severe impairments the Social Security [Act] requires the

[Commissioner] to consider the combined effects of the impairments in making a disability

determination."  Campbell v. Bowen, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing 42 U.S.C. §

423(d)(2)(C)).  However, the mere existence of a severe impairment or combination of

impairments does not require a finding that an individual is disabled within the meaning of the

Social Security Act.  To be disabling, the claimant's condition must be so functionally limiting

as to preclude any substantial gainful activity for at least twelve consecutive months.  See Kelley

v. Chater, 62 F.3d 335, 338 (10th Cir. 1995).

The Commissioner has established a five-step sequential evaluation process for determining whether a claimant is disabled:

1.   The ALJ must first ascertain whether the claimant is engaged in substantial gainful activity.  A claimant who is working is not disabled regardless of the medical findings.

2.   The ALJ  must then determine whether the claimed impairment is "severe."  A "severe impairment" must significantly limit the claimant's physical or mental ability to do basic work activities.

3.   The ALJ must then determine if the impairment meets or medically equals in severity certain impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.   If the claimant's impairment does not meet or equal a listed impairment, the ALJ must determine whether the claimant has the residual functional capacity ("RFC") to perform his past work despite any limitations.

5.   If the claimant does not have the RFC to perform his past work, the ALJ must decide whether the claimant can perform any other gainful and substantial work in the economy.  This determination is made on the basis of the claimant's age, education, work experience, and RFC.

20 C.F.R. §§ 404.1520(a)-(f).  See also Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir. 1988).

The claimant has the initial burden of establishing a disability in the first four steps of

this analysis.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987).  The burden then shifts to the

Commissioner to show that the claimant is capable of performing work in the national economy.

<u>Id.</u>  A finding at any point in the five-step review either that the claimant is disabled or not is

conclusive and terminates the analysis.  <u>Casias v. Secretary of Health & Human Services</u>, 933

F.2d 799, 801 (10th Cir. 1991).

## IV.  ANALYSIS

The ALJ found that (1) the plaintiff meets the insured status requirements of the Social

Security Act through March 31, 2010; (2) the plaintiff has not engaged in substantial gainful

activity since January 5, 2005, the alleged disability onset date; (3) the plaintiff has the following

severe impairments: degenerative cervical disc disease, a history of a soft tissue/whiplash injury

with headaches and shoulder strain, status-post left ankle fracture with open reduction surgery,

and major depressive disorder; (4) the plaintiff does not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments in 20

C.F.R. 404, Subpart P, Appendix 1; (5) from January 4, 2005, to January 2006, the plaintiff had

the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; sit for two hours at a

time and 8 hours per day; stand and/or walk for 20 minutes at a time for four to six hours total in

an eight hour day with regular breaks; occasionally push and pull using the left lower extremity;

never use foot controls with that extremity; never climb ladders or scaffold; never balance;

occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; not work around open

machinery or at unprotected heights; not ambulate over rocky terrain; understand, remember, and

carry out work instruction that could be learned within 90 days; and have frequent interaction

with co-workers, supervisors, and the public; (6) from January 1, 2006, to the date of the

decision, the plaintiff has the RFC to lift and carry at least 20 pounds occasionally and 10 pounds frequently; sit for two hours at a time and approximately six hours per day; stand and/or walk for two hours at a time for six hours total in an eight hour day with the opportunity to sit briefly every 30 minutes; not use foot controls with the left lower extremity; never climb ladders or scaffold; never balance; frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; not work around open machinery or at unprotected heights; not ambulate over rocky terrain; can understand, remember, and carry out work instructions that could be learned within 90 days; and have frequent interaction with co-workers, supervisors, and the public; (7) transferability of job skills is not material to the decision because the plaintiff is not disabled; (8) from January 4, 2005 until January 1, 2006, jobs existed in significant numbers in the national economy that the plaintiff could have performed; and (9) the plaintiff has not been under a disability as defined by the Social Security Act from January 5, 2005, through the date of the decision.

The plaintiff claims that the ALJ erred when he (1) gave little weight to the opinions of the treating physician without consideration of all the requisite factors and (2) failed to state which factors he used in finding the plaintiff lacked credibility.

## A.   Weight of Treating and Examining Sources

The plaintiff argues that the ALJ erred when he gave little weight to the opinions of Dr. Drapeau, a treating physician, and Dr. Feinsinger, an examining physician. *Plaintiff's Opening Brief*, pp. 19-27.

The ALJ is tasked with evaluating every medical opinion in the record. 20 C.F.R. § 1525(d). The opinion of a treating physician as to the nature and severity of a claimant's impairment is entitled to controlling weight so long as it is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).[7] The

Tenth Circuit Court of Appeals has stated:

> Under the regulations, the agency rulings, and our case law, an
> ALJ must give good reasons in the notice of determination or
> decision for the weight assigned to a treating physician's opinion.
> Further, the notice of determination or decision must be
> sufficiently specific to make clear to any subsequent reviewers the
> weight the adjudicator gave to the treating source's medical
> opinion and the reasons for that weight. . . .
>
> The regulations and agency rulings give guidance on the
> framework an ALJ should follow when dealing with treating
> source medical opinions relating to the nature and severity of
> impairments. An ALJ should generally, give more weight to
> opinions from claimant's treating sources. In deciding how much
> weight to give a treating source opinion, an ALJ must first
> determine whether the opinion qualifies for controlling weight. An
> ALJ should keep in mind that it is an error to give an opinion
> controlling weight simply because it is the opinion of a treating
> source if it is not well-supported by medically acceptable clinical
> and laboratory diagnostic techniques or if it is inconsistent with the
> other substantial evidence in the case record.
>
> The analysis is sequential. An ALJ must first consider whether the
> opinion is well-supported by medically acceptable clinical and
> laboratory diagnostic techniques. If the answer to this question is
> no, then the inquiry at this stage is complete. If the ALJ finds that
> the opinion is well-supported, he must then confirm that the
> opinion is consistent with other substantial evidence in the record.
> In other words, if the opinion is deficient in either of these

_____

[7]By contrast, treating source opinions are not afforded any special significance or
controlling weight in the determination of issues reserved to the Commissioner, such as the
determination of a claimant's RFC. See 20 C.F.R. §§ 404.1527(e) and 416.927(e); Sosa v.
Barnhart, 2003 WL 21436102 at *5 (D. Kan. April 10, 2003), adopted, 2003 WL 21418384 (D.
Kan. Jun. 17, 2003). Nevertheless, "[t]he RFC assessment must always consider and address
medical source opinions. If the RFC assessment conflicts with an opinion from a medical
source, the adjudicator must explain why the opinion was not adopted." Social Security Ruling
96-8p, 1996 WL 374184 at *7.

respects, then it is not entitled to controlling weight.  The agency ruling contemplates that the ALJ will make a finding as to whether a treating source opinion is entitled to controlling weight. . . .

But resolving the "controlling weight" issue does not end our review.  In completing the analysis[,] adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.

Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

After considering the pertinent factors, the ALJ must give good reasons in the notice of determination or decision for the weight he ultimately assigns the opinion.  Finally, if the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so.

Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003) (internal quotations and citations

omitted).  See also Social Security Ruling ("SSR") 96-2p, 1996 WL 374188.[8]

Unless a treating source's opinion is given controlling weight, the following factors are

considered in deciding the weight given to any medical opinion: (1) the examining relationship,

_____

[8]Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted.  20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding precedent upon ALJs.  Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

(2) the treatment relationship, (3) the length of the treatment relationship and the frequency of

examination, (4) the nature and extent of the treatment relationship, (5) supportability, (6)

consistency with the record, (7) specialization of the source of the opinion, and (8) other relevant

factors.  20 C.F.R. §§ 404.1527(d).  All of the evidence from a nonexamining source is

considered to be opinion evidence.  Id. at 404.1527(f).  An ALJ may "ask for and consider

opinions from medical experts on the nature and severity of" a claimant's impairments.  The ALJ

evaluates those opinions using the factors found in section 404.1527(d).  Id. at

404.1527(f)(2)(iii).

Here, the ALJ gave little weight to the opinions of Dr. Drapeau and Dr. Feinsinger.  He

found the opinion of Dr. Gurvey to be the most persuasive in establishing the claimant's physical

functional capabilities.  The ALJ acknowledged that Dr. Drapeau completed an assessment of the

plaintiff's ability to engage in work-related physical activities on August 22, 2008.  He noted

that Dr. Drapeau opined that the plaintiff was limited to occasional lifting of up to 10 pounds;

could sit for 15 minutes at a time and for two hours in an eight hour day; could stand and walk

for 15 minutes at a time for one hour in an eight hour day and would need to lie down or change

positions for the remainder of the day; could not perform any fingering activities; could only

occasionally reach, push, pull, handle, and feel; could never use foot controls with the left lower

extremity; could frequently use foot controls with the right lower extremity; could never engage

in any postural activities; could occasionally drive; could be occasionally exposed to pulmonary

irritants; and could never work at unprotected heights, around moving machinery, or around

extreme temperatures, humidity and wetness, and vibration.  *Record*, p. 74.

The ALJ accorded little weight to Dr. Drapeau's August 2008 opinion because it was

medically unsupported and inconsistent with other, better reasoned medical evidence. *Record*, p.

75. He explained that, as discussed by Dr. Gurvey at the two hearings, many of the functional

limitations indicated by Dr. Drapeau were unsupported by the objective medical findings. He

also gave little weight to the opinion of Dr. Feinsinger because it was not supported by the

record or by his own objective findings. Specifically, the ALJ stated:

> Dr. Gurvey opined that there appears to be no medical basis for
> any limitations on sitting, and though the claimant clearly had
> some limitations on prolonged standing and walking particularly in
> the first few months following her January 2005 ankle fracture, by
> November 29, 2005, the claimant's fracture was considered to be
> well united (Exhibit 9F). At that time she also failed to exhibit any
> significant strength or range of motion deficits in the lower
> extremities. And, despite the claimant's testimony that she
> continues to require use of a walking boot, a thorough review of
> her clinical treatment records after November 2005 does not
> indicate that any type of assistive device has been medically
> prescribed (Exhibits 11F, 12F, 13F, 17F, 22F and 24F).
>
> In terms of the claimant's ability to lift, and especially with respect
> to her capacity for manipulative functioning, Dr. Gurvey testified
> that despite the claimant's well-documented cervical spine
> impairment, she simply does not have substantiating objective
> findings to support a restriction to only sedentary lifting.
> Moreover, Dr. Gurvey observed no clinical correlation for any
> appreciable manipulative limitations. It is noted that while Dr.
> Drapeau notes "decreased sensation and fine motor control of the
> fingers and hands" in support of her manipulative restrictions, this
> is really based on <u>subjective complaints</u> only, as there are
> essentially <u>no substantiating neurologic findings throughout her
> treatment of the claimant.</u> Similarly, there is nothing in her records
> to support a total inability to engage in any postural activities.
> And, as observed by Dr. Gurvey, there is no medical justification
> for some of Dr. Drapeau's environmental restrictions (e.g., limited
> exposure to fumes, dusts and other pulmonary irritants). For these
> reasons, the August 2008 functional capacity assessment of Dr.
> Drapeau, though she is a treating medical provider, is considered
> medically unsupported, and it is inconsistent with other better
> reasoned medical evidence. The Administrative Law Judge
> therefore rejects her opinion and accords it little weight (SSR 06-

03p).  It seems from evaluating the opinions of Dr. Drapeau, that she has taken on the role of an advocate on behalf of her patient, an understandable role that comes with contact with a patient, but not one that provides reliable evidence for the purpose of a disability determination.

Subsequent treatment records from Dr. Drapeau and others similarly fail to support the restrictions on work functioning she gave in August 2008 (Exhibits 17F, 22F and 24F).  These records continue to note subjective complaints of neck and ankle pain, and some radiation of symptoms into the upper extremities, but there is little in terms of any objective medical findings.  And particularly there [] is no neurologic evidence of radiculopathy or neuropathy. The undersigned acknowledges, consistent with the testimony of Dr. Gurvey, that at times the claimant has continued to exhibit some ankle swelling.  There is no evidence of ankle instability, however, and again x-rays have shown there to be solid union of the previous fracture.  It is also worth noting that despite some mention of memory and concentration difficulty in these records, the claimant is consistently described as alert and oriented, with no indication for any unusual anxiety or depression.

The record[] shows that on February 14, 2010, Dr. Drapeau authored a letter outlining the claimant's primary medical problems (Exhibit 25F).  According to Dr. Drapeau, these consist of "neck pain," "ankle pain," and "depression, memory loss." Regarding the claimant's neck problems, Dr. Drapeau cited the claimant's July 2005 MRI findings of moderate to advanced C5-6 degeneration with some impingement.  She observed that this would put pressure on the nerves, causing pain, numbness and weakness in the upper extremities, and that more than minimal lifting, pushing, pulling or working overhead would cause traction the compromised roots, causing more pain.  Dr. Gurvey testified that while indeed these symptoms and limitations <u>could be caused by cervical degeneration, there is simply insufficient objective medical evidence in this case to show that the claimant is actually experiencing this level of impairment.</u>  Dr. Gurvey similarly failed to accept Dr. Drapeau's generalization of symptoms and limitations caused by the claimant's ankle fracture, and presumed arthritis, noting that while other people could reasonably experience chronic and disabling ankle problems, the claimant herein does not have objective support for a disabling level of ankle impairment.

Regarding the claimant's physical impairments and related ability to work, the undersigned notes that the record contains one additional medical opinion. Dr. Feinsinger conducted a consultative physical examination of the claimant in June 2008 (Exhibit 15F). Similar to Dr. Drapeau, Dr. Feinsinger opined that the claimant could only sit and stand for 15 minutes at a time. He limited the claimant to only 5 pounds of lifting and carrying. Dr. Feinsinger did not offer any specific manipulative or postural limitations, but concluded generally that the claimant would be unable to perform any gainful employment. In support, he cited the claimant's "chronic pain, chronic headaches, and memory problems," which are all subjective complaints. As noted by Dr. Gurvey, who actually cited Dr. Feinsinger's examination in support of his testimony, this source actually fails to observe any significant objective findings. The claimant did have decreased cervical range of motion, <u>but her strength, sensation and reflexes were normal in the upper extremities.</u> It is noted that the claimant also had decreased lumbar range of motion at that time, but as previously indicated Dr. Gurvey opined that the medical record as a whole fails to establish the existence of medically determinable lumbar impairment. In sum, the objective findings of this examiner simply fail to support the degree of functional impairment he indicated, and in that regard, Dr. Feinsinger's assessment of the claimant's ability to work has been given little weight (SSR 06-03p). It is also worth noting that this source did observe the claimant to be "somewhat groggy and sedated" during the evaluation, and consistent with other evidence it was suggested that the claimant might be over-medicated.

In sum, after independently reviewing all the available medical evidence, the Administrative Law Judge finds the opinion of Dr. Gurvey to be well reasoned, well supported and the most persuasive in establishing the claimant's physical functional capabilities. Moreover, it is backed by his review of the entire medical record. Accordingly, his assessment of the claimant's ability to engage in work-related physical activities has been given substantial weight, and indeed greater weight than the opinion of Dr. Drapeau. As discussed, despite this source's status as a treating physician, her opinion regarding the claimant's ability to work is unsupported by her own clinical findings and is inconsistent with other substantial medical evidence. Therefore, Dr. Drapeau's opinion is not entitled to the controlling weight that is typically given to a treating medical provider, and it has instead been given little weight in this matter (SSR 06-03p).

Id. at pp. 74-76 (emphasis in original).

The ALJ also acknowledged that Dr. Drapeau completed an assessment of the plaintiff's ability to engage in work-related mental activities in November 2009.  He noted that Dr. Drapeau cited (1) depression and (2) concentration and memory deficits as significant medical problems and opined that the plaintiff was markedly limited with respect to understanding and memory and social interaction and adaptation.  The ALJ rejected Dr. Drapeau's opinion because it was unsupported by Dr. Drapeau's own clinical treatment records and was inconsistent with other substantial medical evidence.  *Record*, p. 76.  The ALJ stated:

> Actually, the available medical record contains no evidence of any specialized mental health treatment.  The claimant has been prescribed various anti-depressant medications by Dr. Drapeau, a family practitioner with no apparent mental health expertise, and generally her records show the claimant to have improved depressive symptoms with medication management alone (Exhibits 11F, 12F, 13F, 17F, 22F, and 24F).
>
> The only detailed mental status findings in the record are contained in the consultative psychological report of Dr. Morton (Exhibit 14F).  The record shows that Dr. Morton evaluated the claimant in May 2008 for complaints of depression, memory and concentration difficulties.  Based on his examination, Dr. Morton found no indication for a significant memory impairment, as the claimant was able to recall 4 unrelated words immediately and 3 of these words after 10 minutes.  The claimant also did well with serial 3's and serial 7's.  Her judgment and reasoning appeared adequate and she demonstrated a thinking ability within normal limits.  The claimant was assessed with only mild mental limitations in regard to remembering and understanding instructions, procedures and locations, and moderate limitations in regard to carrying out instructions.  Minimal mental limitations were indicated in terms of maintaining attention, concentration and pace, and with respect to work-related social interaction and adaptation.  These limitations do not comport with a disabling level of mental impairment and certainly do not support the "marked" mental deficits indicated by Dr. Drapeau.

Dr. Winfrey, the medical expert at the hearing, cited the examination findings of Dr. Morton, along with the clinical treatment records of Dr. Drapeau and the neurologic findings of Dr. Friedman (Exhibit 8F), in opining that the claimant has no limitations with respect to simple work instructions and procedures and that she would be only mildly limited in terms of understanding, remembering and carrying out more detailed work instructions.  Dr. Winfrey found no deficits in terms of work-related social interaction and adaptation.  Substantial weight has been given to her opinion (SSR 06-03p).  It supports the mental residual functional capacities found in this decision.

Of further interest, it is noted that during the May 2008 consultative psychological examination the claimant was observed to have a <u>normal posture, locomotion and gait.</u>  She evidenced no difficulty with extended sitting or arising from a seated position.  This conflicts with the claimant's testimony regarding her physical complaints and resulting limitations and also contradicts the disabling physical functional limitations offered by Dr. Drapeau, further diminishing their credibility in this matter.

In sum, the undersigned has considered the claimant's subjective complaints and the history she provided to doctors, as well as any written information she provided to the Social Security Administration.  In addition, medical signs and findings and the opinions of the claimant's treating and examining sources have been examined.  In so doing, the undersigned concludes that the claimant's allegations are not fully persuasive concerning the extent of her functional limitations since the alleged disability onset date.

Id. at pp. 76-77 (emphasis in original).

Thus, the ALJ made clear the weight he gave to Dr. Drapeau and Dr. Feinsinger's opinions, and he discussed in detail the reasons for that weight.  He found that Dr. Drapeau's opinions were not entitled to controlling weight because they were not well-supported by medically acceptable clinical and laboratory techniques and were not consistent with other substantial evidence in the record, including her own clinical findings.  The ALJ discussed the

treatment relationships,[9] the degree to which Dr. Drapeau and Dr. Feinsinger's opinions were supported by the evidence (and their own objective findings), the consistency between their opinions and the record as a whole, and other relevant factors.  He was not required to do more. Moreover, after an extensive review of the record, I find that the ALJ's findings are supported by substantial evidence.

### B.   Credibility Finding

The plaintiff also argues that the ALJ failed to base his credibility findings in substantial evidence.  *Plaintiff's Opening Brief*, p. 27.

"[W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record."  SSR 96–7p, 1996 WL 374186 at *2.  In addition to the objective medical evidence, the ALJ must consider other factors when assessing the credibility of an individual's statements, including:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the

---

[9]The ALJ specifically acknowledged that Dr. Drapeau is a family practitioner and is the plaintiff's treating primary care physician, and he discussed Dr. Drapeau's treatment records from 2005 until 2010, including the treatment she provided, and her objective assessments.

individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id. at *3.

"In making a finding about the credibility of an individuals statements, the adjudicator need not totally accept or totally reject the individual's statements.  Based on a consideration of all of the evidence in the case record, the adjudicator may find all, only some, or none of an individual's allegations to be credible."  SSR 96–7p, 1996 WL 374186, at *4.

Here, the ALJ found that the plaintiff was not fully credible.  *Record*, pp. 72, 77.  The ALJ discussed in detail the plaintiff's reported symptoms; factors that precipitated and aggravated the symptoms; and the medications, treatment, and other measures used to relieve the symptoms and their effectiveness.  Id. at pp. 68-69, 71-77.  In addition, the ALJ discussed the plaintiff's activities of daily living and noted that the plaintiff's reported activities of daily living could not reasonably be accomplished given the frequency and severity of her alleged headache symptoms. Id. at p. 69.  The ALJ found that the plaintiff's testimony regarding her symptoms conflicted with the objective medical evidence, and he supported his findings with specific

evidence in the record.  Id. at pp. 68-69, 71-77.  Substantial evidence supports the ALJ's credibility determination, and his credibility determination complies with SSR 96–7p. Therefore, I find no error in the ALJ's credibility determination.

## V.  CONCLUSION

I have reviewed the entire record.  The record contains substantial evidence to support the ALJ's decision, and the correct legal standards were applied.  I find no error in the ALJ's decision.  Accordingly,

IT IS ORDERED that the decision of the Commissioner is AFFIRMED.

Dated January 26, 2015.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge

49